**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO. 3:25-CR-00022 (SRU)** |
| **v.** | : | |
| **ROSS DELIBRO** | : | **AUGUST 25, 2025** |

<u>**DEFENDANT'S MEMORANDUM IN AID OF SENTENCING**</u>

Ross Delibro will appear before the Court for sentencing on September 8, 2025, with remorse, shame, and regret for his actions in this case. Through his guilty plea in this case on May 15, 2025, his guilty plea in state court on July 3, 2025,[1] and in his statements made during the presentence report (*see* ¶ 70 of PSR), Mr. Delibro has taken complete responsibility for his actions and acknowledges the immense harm to the victims. He recognizes that the harm and hurt he caused in this case warrants punishment, and that he will be punished severely for his actions. Although he knows he cannot undo his actions, he hopes that through his guilty plea, incarceration, and restitution,[2] he can provide some measure of closure to the victims in this case.

Prior to his arrest in this case, Mr. Delibro had never served a period of incarceration. Mr. Delibro, who is 54 years old, has now been incarcerated since June 11, 2024. He has spent the past fourteen months engaged in deep self-reflection and acknowledgement of the impact his actions in this case have had on the victims and how his own history as a victim of abuse

---

[1] Mr. Delibro plead guilty in the Superior Court for the Judicial District of Milford for conduct related to the instant offense. He is scheduled to appear for sentencing in Milford on September 11, 2025, and will be sentenced to an agreed upon sentence of 25 years, suspended after serving 15 years, with 25 years of probation.

[2] Mr. Delibro has placed funds in undersigned counsel's trust account for the payment of restitution in this case. To date, counsel has not received the requested restitution affidavits. Mr. Delibro remains ready and willing to begin paying restitution immediately upon receipt of those affidavits.

impacted his decisions in this case. Mr. Delibro recognizes that he needs sustained mental health treatment and welcomes that treatment.

Our request, respectfully submitted, is that the Court impose the mandatory minimum sentence of 180 months. Such a sentence takes into consideration the seriousness of the offense, Mr. Delibro's history and characteristics, including his age, history of abuse, and lack of criminal history, as well as other factors discussed below, and is significant enough to satisfy the purposes of just punishment.

## I.    *Case History*

Mr. Delibro was arrested by state authorities on June 11, 2024, for conduct that constitutes the instant offense, and he was held on a million-dollar bond. While being held pretrial in state custody, a federal complaint was filed against him in this case on July 1, 2024. *See* Doc. No. 1. Mr. Delibro was presented in front of Magistrate Judge Vatti on July 8, 2024, and he later consented to detention in light of the state bonds. *See* Doc. No. 17. For over a year, until shortly after his guilty plea in state court on July 3, 2025, he remained in primary state custody with a federal detainer.

From very early on in this case, Mr. Delibro indicated his intention to enter a guilty plea and take responsibility for his actions that led to his arrest. On May 15, 2025, Mr. Delibro entered guilty pleas to Count One, Sexual Exploitation of Children, in violation of 18 U.S.C. §§ 2251(a) and (c) and Count Three, Possession of Child Pornography, in violation of 18 U.S.C. §§ 2252A(a)(5)(B) and (b)(2). Although there is no written plea agreement in this case, the government has agreed that it will dismiss Count Two of the indictment following Mr. Delibro's sentencing in this case.

II.     ***Guidelines Calculation***

The Guidelines calculation is as follows:

The Guideline for Count One (Sexual Exploitation, 18 U.S.C. § 2251(a)) is U.S.S.G. § 2G2.1, which provides a base offense level of 32. The Guideline for Count Three (Possession, 18 U.S.C. § 2252A(a)) is U.S.S.G. § 2G2.2, which provides a base offense level of 22. However, per the cross reference in § 2G2.2(c)(1), if the offense (possession) involves the possession of a visual depiction produced by the defendant, then § 2G2.1 (the guideline for sexual exploitation) is used to calculate the guideline range. Thus, Count One and Count Three are calculated using the same guideline section, and the same conduct (i.e., the production of a visual depiction of a minor). As such, as found by the by the Probation Office (*see* ¶ 19 of the PSR), these counts are grouped together pursuant to U.S.S.G. § 3D1.2(b).[3]

Mr. Delibro does not dispute the applicability of the four offense characteristic enhancements found in the PSR (*see* ¶¶ 29-32): a four-point enhancement under § 2G2.1(b)(1)(A), a two-point enhancement under § 2G2.1(b)(2)(A), a four-point enhancement under § 2G2.1(b)(4)(B), and a two-point enhancement under § 2G2.1(b)(5). Yet, for reasons discussed herein, the two-level enhancement found in ¶ 35 for obstruction of justice is not appropriate in this case. Accordingly, as the parties agree that Delibro's criminal history score is zero, and he falls into a criminal history Category I, he submits that the appropriate guideline

---

[3] The government disagrees with this analysis and argues that the two counts do not group together because "Count Three includes victims who are not accounted for in Count One." This is incorrect. Because the cross reference in § 2G2.2(c)(1) requires Count Three to be calculated using § 2G2.1, Count Three has been calculated using the Count One conduct.

range after accounting for acceptance of responsibility is 324-405 months.[4]

A. <u>Mr. Delibro Did Not Obstruct Justice</u>.

The two-level enhancement for obstruction of justice under § 3C1.1 (*see* ¶ 35 of the PSR) is not appropriate in this case.

The relevant text of § 3C1.1 is as follows:

> If (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct is related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense, increase the offense level by 2 levels.

The application notes advise that "[i]n applying this provision in respect to alleged false testimony or statements by the defendant, the court should be cognizant that inaccurate testimony or statements sometimes may result from confusion, mistake, or faulty memory and, thus, not all inaccurate testimony or statements necessarily reflect a willful attempt to obstruct justice." U.S.S.G. § 3C1.1, Application Note 2. Additionally, the application notes provide examples of conduct ordinarily covered and not covered under this guideline provision. Included in the list of material not covered, in (c), is "providing incomplete or misleading information, not amounting to a material falsehood, in respect to a presentence investigation." *Id*. at Note 5.

In this case, Mr. Delibro did not willfully obstruct or impede justice because he did not provide materially false information during his bail interview. On June 11, 2024, Mr. Delibro was arrested and detained by state authorities. Prior to his arrest by state authorities, Mr. Delibro retained counsel for the purposes of representation in his state cases. It was only after his arrest

---

[4] Base 32 + 4 (2G2.1(b)(1)(A)) + 2 (2G2.1(b)(2)(A)) + 4 (2G2.1(b)(4)(B)) + 2 (2G2.1(b)(5)) – 3 (acceptance) = 41.

and detention by state authorities that Mr. Delibro learned that federal charges would be brought against him. Mr. Delibro had no access to his finances and relied on his parents to make arrangements for counsel on the federal charges with the understanding that he would arrange to reimburse them as soon as he was able.

Thus, during his bail interview on July 1, 2024, Mr. Delibro informed the pretrial services officer that he had one savings account with a balance of approximately $3,000 and a Vanguard retirement account with a balance between $2,000 and $4,000. The government submits that this information was materially false because Mr. Delibro had approximately $20,000 in another savings account at the time of the interview which he later instructed his parents to obtain. However, because at the time of the July 1st interview, the $21,313.56 in his CIT bank account was already owed to Mr. Delibro's parents for the repayment of legal fees, Mr. Delibro understood that this was no longer his money, as it was money owed to his parents.

The failure to include this money during the pretrial bail report interview cannot be said to be information constituting a material falsehood. The application notes define "material" in relevant part as "information that, if believed, would tend to influence or affect the issue under determination." U.S.S.G. § 3C1.1, Application Note 6. There is no evidence to suggest that the information Mr. Delibro provided to bail services would tend to interfere with Court's determination of bail in this case. Notably, the initial bond package proposed by Mr. Delibro, which he later decided not to pursue as he consented to detention, included a non-surety bond co-signed by Mr. Delibro and both of his parents. As such, Mr. Delibro's proposed bond package included a proposal that, were he to violate the terms of the bond, the non-surety bond would have to be realized by himself and his parents, the individuals to whom the money was later

transferred.

Moreover, there is no evidence to suggest that Mr. Delibro provided this information to bail services with any intent to interfere with the investigation, prosecution, or sentencing in this case. As noted by the Second Circuit in *U.S. v. Khimchiachvili*:

> By amending the Application Notes of § 3C1.1 to reflect the holding in *Stroud*, and later in *Belletiere*, the Sentencing Commission twice reaffirmed a commonsense definition of what constitutes obstruction of justice—conduct that willfully interferes with or attempts to interfere with the disposition of the criminal charges against a defendant. An enhancement for obstruction of justice is therefore only warranted 'if the court finds that the defendant willfully and materially impeded the search for justice in the instant offense.' *United States v. Zagari*, 111 F.3d 307, 328 (2d Cir.1997) (emphasis added). Or, as we have written, the 'conclusion that 'obstruct,' in this context, relates to anything that can make it more difficult to carry out a just result in a criminal case [is] erroneous as a matter of law.' *Stroud*, 893 F.2d at 507 (citation omitted). For a defendant's conduct to qualify as obstruction of justice, it must have the 'potential to impede' the investigation, prosecution, or sentencing of the defendant. *See United States v. McKay*, 183 F.3d 89, 95 (2d Cir.1999). It cannot simply be a misrepresentation.

372 F.3d 75, 80 (2d Cir. 2004).

In *Kimchiachvili* the Second Circuit found that the Court erred in enhancing a defendant's sentence under § 3C1.1 for swearing to a false financial affidavit in order to obtain court-appointed counsel: "As the sentencing judge stated, '[t]he motivation for [Mr. Englert's false financial affidavit] is obvious—he did not want to pay for a lawyer.' He was not seeking to prevent justice or even delay it." *Id*. Because the information Mr. Delibro provided was not materially false, nor was it made with any willful intent to obstruct or influence the issues under determination in this case, the obstruction of justice enhancement is not warranted.

## III.     *A Below-Guidelines Sentence is Appropriate Here*

As the Court is well aware, in accordance with the 18 U.S.C. § 3553(a), the Court is directed to consider several factors to impose a sentence that is sufficient, but not greater than

necessary, to comply with the purposes of sentencing. Title 18 provides the framework and factors to be considered by the sentencing judge in determining the particular sentence to be imposed. The Court is directed to consider the history and characteristics of each individual defendant in order to impose a sentence which reflects the seriousness of the offense, promotes respect for the law, and provides just punishment.

In determining an appropriate sentence, the sentencing court must apply the "parsimony clause" set forth in 18 U.S.C. § 3553(a), which provides that courts "shall impose a sentence sufficient, but not greater than necessary" to comply with the purposes of sentencing. The Second Circuit explained in *United States v. Ministro-Tapia* that if the Court believes a lower sentence will be as effective as a higher sentence in serving the purposes of sentencing, it must choose the lower sentence. 470 F.3d 137, 142 (2d Cir. 2006) (stating that where a Guidelines' sentence is "in equipoise with [a] below-the-range sentence," the parsimony clause requires imposition of the lower sentence).

An analysis of the § 3553(a) sentencing factors, particularly Mr. Delibro's age and own history of abuse, his lack of a criminal record, his acceptance of responsibility, and his genuine remorse, supports a conclusion that a non-Guidelines sentence is appropriate here.

A.  Mr. Delibro's History and Characteristics

One of the main considerations for the Court to take into account in fashioning an appropriate sentence is Mr. Delibro's history and characteristics. Here, a number of things are important to discuss in adding context to who Mr. Delibro is as a person and how he got to where he is today. There is no doubt that his conduct here was very serious, but a review of his own history of abuse, his mental and physical health, his age, and his conduct since his arrest,

supports a conclusion that a sentence below the guidelines is sufficient to meet the goals of

sentencing.

*i. Mr. Delibro's Mental Health and History of Trauma*

Mr. Delibro grew up in a religious household where emotions were rarely expressed. His

father worked long hours, and his mother was often overwhelmed with the pressures of raising

two young children. Further, from a very early age, Mr. Delibro realized that he was gay. While

society has changed dramatically with respect to how it receives and treats gay people, this was

far from the case 40 years ago. As a young child, Mr. Delibro felt anxious about being outed as

gay, and feared that he would not be accepted by his family or friends if they found out. Indeed,

while Mr. Delibro has now fostered a good relationship with both of his parents, they initially did

not want to accept that he was gay when he first came out to them at 18 years old. The way in

which gay people were ostracized was harmful and isolating for a young child in the early 1980s.

Mr. Delibro's young life was also dramatically shaped by a history of abuse. *See* ¶¶ 56-57

of the PSR. The link between childhood exposure to trauma and adult criminal behavior is well

established by social science literature and studies. Adverse childhood experiences are strongly

associated with factors known to contribute to sexual offense risk, including maladaptive

cognitive schemas, a distorted sense of interpersonal boundaries, disorganized attachment

patterns, and impulsivity.[5] Notably, victims of abuse are themselves more likely to become

---

[5] *See* Bessel Van Der Kolk, The Body Keeps Score: Brain, Mind, and Body in the Healing of Trauma at 70 (2014); Craig Haney, Evolving Standards of Decency: Advancing the Nature and Logic of Capital Mitigation, 36 Hofstra L. Rev. 835, 856-57 (2008)

offenders.[6]

The Sentencing Commission has identified "characteristics . . . relevant in determining whether a sentence outside the applicable guideline range is warranted." U.S.S.G., Chapter Five, Part H, Introductory Comment. A District Court may depart from the Guidelines if one of these characteristics, "individually or in combination with other such characteristics, is present to an unusual degree…" *Id.; see also* U.S.S.G. § 5K2.0(a)(4) ("An offender characteristic or other circumstance identified in Chapter Five, Part H (Offender Characteristics) or elsewhere in the guidelines as not ordinarily relevant in determining whether a departure is warranted may be relevant to this determination. . . .") In accordance with § 5K2.0, Mr. Delibro's own history of abuse is grounds for departure.

### ii. Mr. Delibro's Age and Physical Health

In accordance with 18 U.S.C. § 3553(a)(2)(D), the sentence imposed by the Court shall consider the need for the sentence to provide Mr. Delibro with the "…needed… medical care, or other correctional treatment in the most effective manner." As noted above, Mr. Delibro is currently 54 years old. Thus, a sentence to the mandatory minimum 180 months would mean he is incarcerated until he is nearly 70 years old. Further, as noted in the presentence report, ¶ 64, Mr. Delibro suffers from a chronic illness. While in the Bureau of Prisons, Mr. Delibro will require ongoing medical assessments and monitoring. These are both important considerations for the Court in fashioning a just and appropriate sentence.

---

[6] Hecht, D. B., & Hansen, D. J., *Adolescent victims and intergenerational issues in sexual abuse,* Handbook of Psychological Approaches with Violent Offenders: Contemporary Strategies and Issues (1999), *can be accessed at* https://digitalcommons.unl.edu/cgi/viewcontent.cgi?params=/context/psychfacpub/article/1219/ &path_info=Hansen_1999__Adol_Victims.pdf

          *iii. Mr. Delibro's Self-Reflection and Need to Engage in Mental Health Treatment*

Since his arrest, Mr. Delibro has engaged in thoughtful self-reflection to understand his actions in this case. Importantly, Mr. Delibro has deep regret for the actions in this case and does not try to make excuses for or downplay his actions. This genuine remorse is palpable and readily recognized by those around him. *See* Exhibit A, Letter from Janina Delibro, Mr. Delibro's mother ("Ross…he has deep regret from everything that he has done.  He is more concerned with the family involved and his own family. Ross wants to get treatment and therapy.") and Exhibit B, Letter from Warren Delibro, Mr. Delibro's father (explaining that Ross knows that "he has done a terrible thing" and "wants to make amends for his terrible thing.").

Mr. Delibro knows that he needs sustained mental health and sex offender treatment. Although treatment is extraordinarily limited in the Department of Corrections where Mr. Delibro has been and continues to be housed, he has sought information from podcasts and other resources that are available to him there to gain a deeper understanding of the roots of his misconduct.

Although the Bureau of Prisons provides both residential and non-residential sex offender treatment programs, Mr. Delibro will not receive this treatment for years. The reason being "[i]nmates ordinarily participate in the [two relevant] programs during the remaining 36-48 months of their sentence." *See* Bureau of Prisons, "Sex Offenders," available at https://www.bop.gov/inmates/custody_and_care/sex_offenders.jsp ("Offenders typically participate in sex offender treatment in the final three years of their incarceration"). As such, it is fair to say that the longer Mr. Delibro's sentence is, the more time treatment will be delayed. There is no reason to further postpone treatment any longer than it already will be delayed. This

would be antithetical to rehabilitation in violation of 18 U.S.C. § 3553(a)(2)(D) and, almost

standing alone, would make a sentence of anything more than 15 years "greater than necessary"

to accomplish the purposes of sentencing.

      B.  <u>The Guidelines in Production and Possession Cases were not Based on Empirical<br>Evidence and Vastly Overstate the Offense.</u>

There is wide recognition that the Sentencing Guidelines applicable to sex offenses are

excessive. As evidenced by the fact that they are higher than the Guidelines for murder, the

advisory nature of the Guidelines is particularly important in cases involving the production of

child pornography. As noted by the United States Supreme Court in *Kimbrough v. United States*,

where the applicable Guidelines ranges are based on Congressional dictates and not on

"empirical data and national experience," the Guidelines are not entitled to the same deference,

particularly when the Commission, itself, has expressed concern that the Guidelines ranges are

unreasonable. 552 U.S. 85, 109 (2007).

That is precisely the case in regard to the Guidelines for child pornography offenses, as

the Court of Appeals held in *United States v. Dorvee*, 616 F.3d 174 (2d Cir. 2010), and *United*

*States v. Tutty*, 612 F.3d 128 (2d Cir. 2010). Although *Dorvee* addressed the Guidelines

applicable to cases involving possession and distribution of child pornography under § 2G2.2,

whereas this case also involved sexual exploitation of a minor by production of child

pornography under § 2G2.1, these two Guidelines sections suffer from many of the same

problems.

Specifically, § 2G2.1 – like § 2G2.2 – does "not reflect empirical analysis, but

congressional mandates that interfere with and undermine the work of the Sentencing

Commission." *United States v. Almazan*, 908 F. Supp. 2d 963, 970 (N.D. Iowa 2012); *see also*

*United States v. Brown*, 843 F.3d 74, 89 (2d Cir. 2016) (Pooler, J., dissenting) (noting that "much of the *Dorvee* court's criticism of the child pornography guidelines applies to the guidelines for production offenses as well"). Like § 2G2.2, § 2G2.1 recommends "enhancements that [do] not distinguish between least and worse offenders" and "enhancements for conduct present in nearly every case[.]" *See United States v. Jacob*, 631 F. Supp. 2d 1099, 1115 (N.D. Iowa 2009); *United States v. Price*, 2012 WL 966971 at *11 (C.D. Ill. Mar. 21, 2012) (holding that § 2G2.1 "presents some of the same problems presented by § 2G2.2"); *United States v. Krueger*, 2009 WL 4164122 at *3 (E.D. Wis. Nov. 23, 2009) (finding same).

The *Dorvee* Court explained that the child pornography guidelines are not based on Commission research of past sentencing practices, but rather, have increased over time as a result of Congressional mandates in direct contravention of Commission recommendations. *Dorvee*, 616 F.3d at 185-86. Because the Guidelines include enhancements that apply in the vast majority of all cases, these guidelines, unless carefully considered and applied, will result in substantively unreasonable sentences in many cases. *Id*. at 184. Other courts have reached a similar conclusion. *See, e.g., United States v. Riley*, 655 F. Supp. 2d 1298 (S.D. Fla. 2009); *United States v. Grober*, 595 F. Supp. 2d 382 (D. N.J. 2008); *United States v. Stern*, 590 F. Supp. 2d 945 (N.D. Ohio 2008); *United States v. Doktor*, 2008 WL 5334121 (M.D. Fla. Dec. 19, 2008); *United States v. Johnson*, 588 F. Supp. 2d 997 (S.D. Iowa 2008); *United States v. Noxon*, 2008 WL 4758583 (D. Kan. Oct. 28, 2008); *United States v. Shipley*, 560 F. Supp. 2d 739 (S.D. Iowa 2008); *United States v. Baird*, 580 F. Supp. 2d 889 (D. Neb. 2008); and *United States v. Hanson*, 561 F. Supp. 2d 1004 (E.D. Wis. 2008).

The Guidelines provisions in § 2G2.1 were not developed using the Commission's usual

empirical approach based on past experience. In 2003 and 2004, the Sentencing Commission, at

the direction of Congress, amended the Guidelines under both § 2G2.1 and § 2G2.2 several

times, each time recommending harsher penalties. *See Dorvee*, 616 F.3d at 184; U.S.S.G.

Appendix C, Amendments 661 and 664. As one District Court aptly put it, "the Commission

probably did the best it could under difficult circumstances, but to say that the final product is the

result of Commission data, study, and expertise simply ignores the facts." *United States v. Diaz*,

720 F. Supp. 2d 1039, 1045 (E.D. Wis. 2010). As a result, these Guidelines provisions are

entitled to little deference, and much of the criticism set forth in *Dorvee* applies to production

cases as well. *See United States v. Huffstatler*, 571 F.3d 620, 623 (7th Cir. 2009) (observing that

challenges to validity and fairness of child pornography guidelines apply to production cases,

and, in that case, that the government had conceded as much); *cf. Spears v. United States*, 555

U.S. 261, 266 (2009) (confirming that sentencing courts may vary from Guidelines on policy

grounds).

      In this case, there is no evidence that the two photographs Mr. Delibro took were

distributed or shared in any way. While the sexual assault of a child is very serious, this is one

example in which the modern use of the production statute does not fit conduct that occurred in

this case, and therefore, does not fit the "heartland" of the Guidelines. Further, Guideline

enhancement § 2G2.1(b)(1)(A), which deals with the age of the victim, is already accounted for

in enhancement § 2B2.1(b)(4)(B), and yet, each enhancement adds a separate 4 levels. This

means that Mr. Delibro has an additional 4 levels added as a result of the same conduct.

      This is an unquestionably serious offense, and Mr. Delibro does not wish to understate

the resulting harm of his behavior. Yet, there is ample legal and empirical support for the

proposition that the Guidelines vastly overstate this offense. Accordingly, a sufficient, but not greater than necessary, sentence falls far below the advisory Guidelines.

    C. <u>Other Factors that Warrant a Below-Guidelines Sentence</u>

        *i. Pretrial Credit*

    As discussed above, Mr. Delibro was in primary state custody with a secondary federal detainer from the time of his presentment in federal court—July 1, 2024—to the time he was released to the federal detainer following his guilty plea in state court—July 10, 2025.[7] This was due in large part to the fact that he was arrested by the state first and held on a high bond. Practically speaking for Mr. Delibro, this means that despite being detained at his initial federal appearance, he was not receiving federal jail credit for that entire duration (July 1, 2024-July 10, 2025) which amounts to a little over 12 months.

    The Bureau of Prisons will not credit time used by another sovereign. Since Mr. Delibro is receiving a sentence in the related state proceeding, the Bureau of Prisons will not credit that time toward his federal sentence. Accordingly, Mr. Delibro respectfully requests that when determining an appropriate sentence, the Court take into consideration the fact that there is a very real possibility that he will be serving 12 extra months.

    ii. *Incremental Punishment*

    In *United States v. Mishoe*, the Second Circuit stated:

> Obviously, a major reason for imposing an especially long sentence upon those who have committed prior offenses is to achieve a deterrent effect that the prior punishments failed to achieve. That reason requires an appropriate relationship between the sentence for the current offense and the sentences . . . for the prior offenses.

---

[7] Despite his guilty plea taking place in state court on July 3, 2024, the United States Marshals confirmed to counsel that Mr. Delibro entered federal custody on July 10, 2025.

241 F.3d 214, 220 (2d Cir. 2001).

While the *Mishoe* decision principally addressed the Career Offender Guidelines, the teaching of that decision applies here. *See United States v. Casteneda*, 191 F. App'x 15, 18 (2d Cir. 2006) (observing that *Mishoe* permits "a departure pursuant to § 4A1.3… 'if the sentencing judge determines, in the exercise of [his] discretion,' that the defendant's criminal history category 'overstates the seriousness of his criminal record.' (emphasis omitted) (quoting *Mishoe*, 241 F.3d at 215)). Some courts have held that when a person has zero criminal history, the *Mishoe* analysis holds even greater weight. *See, e.g.*, *United States v. Germosen*, 473 F. Supp. 2d 221, 227 (D. Mass. Jan. 18, 2007).

The principle behind the *Mishoe* decision is that the sentence must carry a sense of proportionality. Where a person has never served a sentence of incarceration at all and has no criminal history, there is no reason to believe that a Guidelines sentence or anything near it is necessary. As such, the goals of incremental punishment will be satisfied in this case with a sentence of the mandatory minimum of 180 months.

D. The Proposed Sentence Will Not Create Unwarranted Sentencing Disparities

18 U.S.C. § 3553(a)(6) directs the Court "to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." In *United States v. Nathaniel Smith*, Judge Shea imposed a substantial downward variance in sentencing Mr. Smith (convicted of enticement and who also produced an image of child pornography), who traveled from Colorado to Connecticut to have sex with a 13-year-old girl. *See* Judgment, *United States v. Smith*, No. 3:16-cr-48 (MPS), ECF No. 65 (D. Conn. Apr. 12, 2017). Judge Shea imposed a sentence of 146 months, which was a significant downward

-15-

variance based on *Dorvee* and § 5H1.3 from the recommended Guidelines imprisonment range of 324–405 months. In *United States v. Galpin*, 3:21-cr-32(JAM), Judge Meyer imposed a total effective sentence of 18 years, concurrent, for two counts of production of child pornography and two counts of possession in two different cases, one arising out of Connecticut and another Rule 20 case arising out of the District of Columbia. Notably, that case involved countless images and distribution.

Mr. Delibro's conduct, while incredibly serious, is devoid of the aggravating circumstances that have justified higher sentences in other cases in this district. For example, in *United States v. Butts*, No. 3:23-cr-201 (KAD), (D. Conn. Apr. 23, 2025), Judge Dooley imposed a 240-month sentence for Mr. Butts who used threats of physical and sexual violence to entice his victims to send him sexually explicit images over a period of three years. During one instance, Mr. Butts threatened to harm the victim and sexually abuse the victim's missing friends, who he claimed to have captured and sexually assaulted, if the minor victim did meet his demands and have sexual intercourse with him. In *United States v. Dos Reis,* the Second Circuit affirmed this Court's upward departure, from 87 months to an effective sentence of 30 years (120 months and 180 months consecutive) where a 24-year-old defendant traveled from New York to Danbury to have sex with a 13-year-old whom *he killed* during sex while he asphyxiated her. 369 F.3d 142 (2d. Cir. 2004). In *United States v. Acosta Torres*, No. 3:21-cr-139(JBA), Judge Arterton sentenced a defendant to 30 years where he pled to sexual exploitation of a minor; however, Mr. Torres produced child pornography by raping multiple young children over the course of years. In *United States v. Barros-Terreros*, No. 3:23-cr-00091 (RNC), the Court imposed a 26-year sentence on a defendant who repeatedly had sex with his partner's nine-year-

-16-

old daughter over the course of a year. In that case, the defendant's conduct went beyond simply sexually abusing the minor victim. There, the defendant explicitly used the photographs he had taken of the victim to blackmail the minor victim in silence and used the photographs as a "mental weapon" against the victim.

Mr. Delibro does not contend that he is on the less serious end of this spectrum. This is a production case which involves a very young victim. But the facts of this case do not place him at the highest end of the spectrum either. Mr. Delibro took two photographs of the minor victim over a period of minutes. There is no evidence of the production of other any other images, or of distribution of those images. Indeed, Mr. Delibro's devices were searched and each of the families Mr. Delibro provided caretaking services for were interviewed in the investigation into this case; no other instances of abuse were reported or uncovered. Thus, Mr. Delibro's case lacks (1) multiple victims, (2) numerous images created over a lengthy period of time, (3) distribution of the images he produced, or any other images,[8] (4) the use of the photographs and/or videos to coerce, manipulate, or otherwise harm the victim or (5) traditional violence that have marked longer sentences. A mandatory minimum sentence would place this Court's sentence in a legitimate place among this range of outcomes.

_____

[8] The government asserts that by using the peer-to-peer eDonkey/aMule program, Mr. Delibro shared images of child pornography. Although Courts have found this activity sufficient to uphold a conviction for distribution, *see United States v. Clarke*, 979 F.3d 82 (2nd Cir. 2020), it is important to note that a feature of program is that files can be obtained from users of the program while the user is downloading files him/herself without any affirmative action on the part of the user to share these files. Beyond his use of the program, there is no evidence that Mr. Delibro took any affirmative action to share any materials with others.

**IV.    The § 3553(a) Factors Support a Mandatory Minimum Sentence**

A sentence of 15 years is sufficient, but not greater than necessary to satisfy the purposes of sentencing. Pursuant to 18 U.S.C. § 3553(a)(2)(A), Mr. Delibro's sentence must "reflect the seriousness of the offense" and "promote respect for the law." The sentence must also "provide just punishment" for his conduct. *Id*

Mr. Delibro knows that his conduct warrants significant punishment, which he is facing. For any person, a 15-year sentence would be significant, but it is particularly significant here for Mr. Delibro, who is 54 years old, has no criminal history, and has never been incarcerated before. Furthermore, there can be little dispute that a period of incarceration for the offenses to which Mr. Delibro has plead carries with it additional safety concerns which will carry throughout his lifetime. Indeed, shortly after his arrest in this case, fellow inmates at Bridgeport Correctional learned of the charges pending against Mr. Delibro through a television news outlet. Due to the verbal harassment and threats that followed, Mr. Delibro refused housing so that he could be moved into segregation. The fact that Mr. Delibro spent extensive time in segregation voluntarily reflects the gravity of the threats against him. He opted for harsher prison conditions in order to assure his own safety.

Mr. Delibro knows that he cannot undo his actions that have brought him before this Court, as much as he would like to. Through his acceptance of responsibility, Mr. Delibro has sought to bring closure to the victims in his case. For the rest of his life, Mr. Delibro will live with the consequences of his actions. He will be subject to the Sex Offender Registration and Notification Act, which will require him to register as a sex offender in any place he lives or works, and, in light of the agreed upon sentence in state court, he will be subject to probation

supervision for what very well may be the remainder rest of his life.[9] As such, a sentence of 180

months is sufficient, but not greater than necessary in this case.

Respectfully submitted,

THE DEFENDANT,
Ross Delibro

/s/ Kara E. Moreau
Kara E. Moreau
Jacobs & Dow, LLC
350 Orange Street
New Haven, CT 06511
(203) 772-3100 (phone)
(203) 772-1691 (fax)
kmoreau@jacobslaw.com
Federal Bar No. ct30287

August 25, 2025

---

[9] Mr. Delibro is currently 54 years old. If the mandatory minimum 15 years is imposed, Mr. Delibro will be released when he between the ages of 68-69, and subject to probation supervision well into his 90s.

## CERTIFICATE OF SERVICE

I hereby certify that a copy of this Sentencing Memorandum was filed electronically and sent by first-class mail, postage prepaid, to anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system, or by mail to anyone unable to accept electronic filing.  Parties may access this filing through the Court's system.

 /s/   Kara E. Moreau
Kara E. Moreau