UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA

     v.                                      Case No. 3:25-cr-22 (SRU)

ROSS DELIBRO

### **UNITED STATES' MEMORANDUM IN AID OF SENTENCING**

The United States respectfully submits this memorandum in aid of sentencing in the above-captioned case. For the reasons set forth below, the United States asks that the Court adopt the findings of fact in the Presentence Report ("PSR") and impose a slightly below Guidelines sentence of 551 months' imprisonment (reflecting time already served and giving one-year of credit for each acceptance-of-responsibility level), a $34,878.04 fine or special assessment, and a lifetime of supervised release. Delibro's conduct was monstrous. He is a trained early-childhood educator and nanny who sexually assaulted a 2-year-old boy in his care and also collected and shared videos of other child-victims being raped. Apart from pleading guilty in the face of overwhelming evidence, nothing he has done to date actually demonstrates the suggestions in his sentencing memorandum that he understands the severity of his conduct, recognizes the harm he has caused, and truly wants to provide closure to the victims in this case. *See* Def.'s Sent. Memo at 1 (Doc. No. 65). Those empty words are belied by his conduct over many months—including after his arrest—and a near-Guidelines sentence of imprisonment is the minimum necessary considering the sentencing factors found at 18 U.S.C. § 3553. There is no justifiable basis for the 35-year downward departure or variance from the Guidelines that Delibro seeks.

## I.    BACKGROUND OF THE CASE AND DEFENDANT

### A.    Factual Background and Procedural History.

Delibro has long sought access to very young children. He went to school for it. *See* PSR ¶ 71. He worked at preschools. *See* PSR ¶¶ 78-79. He actively solicited nanny work in the homes of people with young, and sometimes special-needs, children. *See, e.g.,* PSR ¶ 77. Then, the United States prosecuted him after identifying him during a child-pornography-distribution investigation and discovering that he had recorded himself brazenly sexually assaulting a 2-year-old boy[1] in the boy's home, while the boy's parent was working in the other room. DeLibro's boldness was remarkable as he, naked from the waist down, recorded himself and the Minor Victim in the Minor Victim's closet, the only part of the room that was not visible on a baby monitor that could have provided a live feed of his conduct to the Minor Victim's mother. And, there is evidence that his abuse went beyond what was shown in the recovered images.

#### 1.    Initial Investigation.

In early 2024, the Connecticut State Police ("CSP") began an investigation into people distributing child pornography[2] using peer-to-peer ("P2P") file-sharing internet-based networks. *See* PSR ¶ 8. Between January 1, 2024, and January 28, 2024, CSP investigators downloaded nine partial videos of CSAM from Delibro's computer. *Id.* One of the videos shows a boy between 8 and 11 years old performing oral sex on, and being anally raped by, an adult man. *Id.* Another shows a boy between 7 and 10 years old being anally raped by a dildo and an adult man. *Id.* CSP

---

[1] To protect the victim's identity, the United States refers to him as Minor Victim.

[2] The United States uses the terms child pornography and CSAM (child sex-abuse materials) to mean the same thing.

then executed a search warrant at Delibro's home and seized, among other things, his MacBook laptop computer, iPhone, and a removable 1 TB hard drive. *Id.* at ¶ 9.

While investigators searched his house, Delibro lied to them. He lied about his use of P2P networks, his use of the program used to share CSAM from his computer, and about having any involvement with CSAM. *See id.* ¶ 10. Over a week later, he called one of the investigators and lied then, too. *Id.* Although he admitted during the phone call that he used the P2P sharing program involved in this case, he persisted in his false story that he had not used it to download CSAM because he had no interest in "that stuff." *Id.*

Perhaps Delibro lied repeatedly because he knew that his methods for producing, obtaining, and saving his collection of child pornography were more sophisticated than most, and because he knew that investigators didn't find—and still haven't found to this day—the removable storage drive where he saved his CSAM library. *See id.* ¶¶ 11, 15. That is, when CSP forensic investigators reviewed Delibro's devices, those devices had fewer CSAM images and videos than one might expect for a person using a P2P file sharing program. Although there was 1 video and 30 images of child pornography found in relatively obscure areas of his computer, investigators learned from forensic log files and other system-generated data that Delibro ran his P2P file-sharing program from, and stored his CSAM files on, at least one PNY removable-storage device. *Id.* Not all defendants are sophisticated enough to do that. What Delibro likely didn't count on, however, were the digital artifacts left on his computer and phone that showed some of what he had on that removable device.

### 2.  Forensic Examination and Sexual Abuse of the Minor Victim.

The forensically recovered evidence included system logs left in the background of Delibro's computer related to over 3,200 files that were associated with his use of the P2P program

to possess and share CSAM, most of which have filenames that are consistent with CSAM. *Id.* In those filenames, the terms "baby," "toddler," "diaper," "infant," "cry," "scream," "1yo," "2yo," "3yo," or "4yo" appear, collectively, over 1,200 times. And some of the filenames include:

    a. "BOY IN DIAPER – Babyboy cum on face toddler best++++";
    b. "[Hurtcore] [Baby Boy] VIDEO_270 baby toddler cum in mouth best";
    c. "[Hurtcore] [Toddler Boy] [Anal Fuck] VIDEO…toddler nice fuck full penetration cry best";
    d. "[Hurtcore] [Baby] babyshowersperm";
    e. "toddler-forced-cum-cry-mom";
    f. "Man Rape 11Yo Crying Boy (preteen dick ass erection sex prno pedo bibcame incest shota naked)";
    g. "[boy+man] 5yo boy get fucked cry hurts";
    h. "[M+B] Man-Play-2yo Crying Son (Anal-Fuck&Cum)";
    i. "Baby 1Yo Cry Force Cum Recopilation";
    j. "(hurtcore,S,6y scream 2M hold down & fuck)";
    k. "13yo Boy Sucks Man-Cums in Boys Mouth";
    l. "sucks 8yo";
    m. "3yo boy";[3]
    n. "pthc boy 2021";
    o. "[man+boy] Canuck"[4]; and, among others,
    p. "10 Yo Blonde Boy"[5].

Attorneys for the United States have asked Delibro, through defense counsel, on multiple occasions after his arrest to either (a) provide the removable storage device (which the United States would have agreed not to use against Delibro) or (b) provide information about how the device was destroyed. Such information would provide comfort to the victims in this case by ensuring that the images he produced and possessed are not distributed in the future. But Delibro has not been willing to provide this information. Without that removable device, there is no way

---

[3] Files k, l, and m were some of the files specifically included in Count Three of the Indictment as examples of images and videos that Delibro knowingly possessed. Delibro pleaded guilty to Count Three.

[4] CSP investigators partially downloaded this file from the defendant during the initial P2P investigation.

[5] CSP investigators partially downloaded this file from the defendant during the initial P2P investigation.

to know whether any of the Delibro's files show him sexually assaulting any children, including the Minor Victim or anyone else, or whether such files have been distributed.

Evidence of Delibro's possession and sharing of child pornography was not all that investigators found on his devices. They also found images on Delibro's phone showing him sexually assaulting the Minor Victim around the usual time of the child's nap on April 23, 2024. *Id.* ¶ 14. The images show Delibro and the Minor Victim inside the Minor Victim's closet. *Id.* Delibro is naked from the waist down and has an erection while the Minor Victim sits on his lap. *Id.* In one of the images, the Minor Victim is holding Delibro's erection. *Id.*

Investigators don't know exactly what happened in the closet on that day, other than what is shown in the images. That's because the images that investigators located are cached files that were automatically created by the phone sometime between the time that Delibro captured the images, saved them to his removable device, and deleted them from his phone's media library. *See id.* ¶ 15. But they do know that the closet was probably the only place in the Minor Victim's home where Delibro could brazenly sexually assault the Minor Victim because (a) one of the Minor Victim's parents was home working at the time, and (b) the closet was an area of the bedroom that could not be seen from a baby camera and monitor that the parents had set up in the Minor Victim's room. *Id.* at ¶ 14. And, even without examining Delibro's removable storage device, there is evidence indicating that the cached photos don't paint a complete picture of his conduct.

After finding the cached images of Delibro's sexual assault of the Minor Victim, investigators looked closely at the phone event log to determine exactly how Delibro used his phone around the time of his sexual assault. *See id.* ¶ 15. Those logs showed that before, during, and after the sexual assault on April 23, Delibro opened his phone, used his camera app, and then, a short time later, used his photo app and a PNY removable-storage app. *Id.* The phone data also

included other photos from around that date, but not images or videos captured at the times shown in the phone log. That information suggests that Delibro activated his phone to take the pictures (or video) and then, a short time later—and possibly during the Minor Victim's nap when the defendant had nothing else to do—looked at the files in his library and moved them to his removable-storage device before deleting them from his phone. That sequence of events is significant because it happened at least one other time, two weeks before. There, too, Delibro used his phone's camera in the afternoon while located at the Minor Victim's home, followed by the photos app and PNY removable-storage app. *See id.* ¶ 15.[6]

But, even more important is what the Minor Victim told his parents about Delibro. He indicated, as relayed by the parents sworn statements to the police, that he had played "games" with Delibro in his bedroom closet (just as shown in the recovered images), that Delibro "likes my butt" and "would put his finger in [my] butt," that he had seen "white juice" coming out of Delibro's penis, and that, among other things, Delibro had bitten and kissed his penis. *Id.* ¶ 16. The Minor Victim also reported that Delibro told him that they would "get in big trouble" if anyone found out about his conduct. *Id.*[7]

### 3. The Victims.

Delibro's conduct has left a number of victims in his wake. He obtained, possessed, and shared images and videos of children being raped or otherwise sexually assaulted, including known

---

[6] Despite the defendant's contention in his sentencing memorandum that there is "no evidence of the production of [ ] any other images," the United States submits that this is, in fact, such evidence, though recognizes that it is not proof beyond a reasonable doubt.

[7] As noted in the PSR, the Minor Victim attended a forensic interview, during which he did not disclose any of Delibro's sexual conduct. He later told his parents that he "didn't try" during the interview. The Minor Victim reported the information about Delibro's conduct to his parents who, in turn, provided the information to police in sworn statements.

victims from the Dalmatians, Brown Sheet, Steff1, and Sany12 series of child pornography. *See* PSR ¶ 22; Initial PSR, Victim Impact Statements, Doc. No. 61-2.

Of course, he also recorded himself victimizing the Minor Victim. The images of Delibro sexually assaulting the Minor Victim weren't enough, alone, however, to identify the child. So, investigators identified at least some of the families for whom Delibro had worked and talked to those who were willing. Eventually, they found the Minor Victim's family and identified the child. Learning that their child had been sexually assaulted by the person they had brought into their home was victimizing it its own right. Sadly, the Minor Victim and family will never be the same. It has affected them in innumerable and unfathomable ways.[8]

It is possible—though the United States cannot conclusively prove—that there are other victims of Delibro's conduct. Delibro apparently built a life to maximize his exposure to children. He has a degree in early childhood education, worked in pre-schools for over a decade, and has been providing care services in family homes since 2017. *Id.* ¶ 71, 76-79. He even signaled it on his license plate, as seen in an image taking during a search of his home.

---

[8] The Minor Victim's family plans to attend the sentencing and provide a statement to the Court. Reliving the trauma that Delibro caused has been extremely difficult, and reducing their thoughts, and how to express those thoughts, to paper has been a process that takes time. If the United States receives a written statement in advance of sentencing, it will produce those to the Probation Office and Court for inclusion in the PSR.



And when seeking in-home care positions, he actively sought out families with young, and sometimes special-needs, children. Care.com is an online platform that enables people looking for care to connect directly with caretakers based on type of care needed (*e.g.,* caring for an adult v. a child), the hours (*e.g.*, weekends or weekdays), and, among other things, any special circumstances (*e.g.*, disabilities or communication-related issues). Delibro used Care.com to find families needing in-home care and, as part of this investigation, law enforcement obtained messages that he exchanged with actual and prospective clients. In one message from 2021, Delibro turned down a potential opportunity and said: "…I only work with children under 16 at this time, and my special needs experience is primarily with Autistic children." *See* Exhibit A (select Care.com messages). In others, he directly solicited families, including those with autistic kids. Many of his solicitations are similar and those apparently targeted to families with special-needs children include language like the following, as included in Exhibit A:

> *My name is Ross and I am interested in your full-time caregiver position. I am confident that I am a great match for your family. I began babysitting children over seventeen years ago, and have been a full-time preschool teacher for eight years. As a teacher I have worked with and nurtured over seven children on the Autism Spectrum, as well as many other children with special needs….I have experience working with infants, toddlers and preschoolers both as a sitter and as a teacher at childcare centers…I am very nurturing and know how to interact with and care for children with Autism.*

He did, in fact, work with special-needs children. One of the families that Delibro served has a severely autistic, non-verbal child. When investigators discovered that Delibro had sexually assaulted the Minor Victim, they went to the autistic child's home, too, and spoke with a parent. The parent tried to get information from the child about whether Delibro had sexually abused him, but the non-verbal child didn't provide anything. What the parent did find, however, was a picture that the child—for an unknown reason—had taken of a person whom the parent believes is Delibro.



The child's parent may never know whether this photo demonstrates innocent conduct or not, but she was troubled enough by it that she shared it with law enforcement investigating Delibro.

### 4. The Criminal Complaint and Arrest.

Based on the available evidence, law enforcement arrested Delibro pursuant to a criminal complaint and arrest warrant signed by the Honorable Robert A. Richardson for the production of child pornography. Delibro made his initial appearance on July 1, 2024, before the Honorable S. Dave Vatti in Bridgeport. Delibro met with a Pretrial Services Officer and completed a financial

affidavit that was later provided to the Court for the initial appearance and bond/detention hearing. *See* PSR ¶¶ 24, 86. As part of that process, Delibro told the Officer that he had one savings account with CIT Bank with a balance of $3,000. *Id.* That was false. Instead, he had *two* CIT Bank accounts with a total value of over $34,000: one in his name alone with a balance of over $21,000, and another in his and his mother's name with a balance of over $13,000. *See* Exhibit B (Redacted Bank Documents).

At that first court appearance before Judge Vatti, Delibro heard directly from the prosecutor that if he was found guilty of the offense charged in the complaint, he could be required to pay a fine, various special assessments, and restitution to the victims. *See* Doc. No. 44 (Transcript). Specifically, the prosecutor said:

> The penalties that accompany the offense are [a] 15 year mandatory minimum penalty with up to 30 years' imprisonment…Supervised release of at least five years up to life. It would require Mr. Delibro to register as a sex offender. There's a fine of up to $250,000. There's a $100 special assessment. And an additional special assessment of $5,000 unless Mr. Delibro is found indigent by the Court at the time of sentencing. And this would also include a yet to be determined amount of restitution to victims.

*Id.* at 7 (emphasis added). He also heard Judge Vatti discuss, at length, the financial resources that might be available to Delibro—primarily the family home—for purposes of creating a bond package. *See id.* at 13-33.

Then, in jail calls over several months that followed, Delibro instructed his parents to move the money out of accounts in his name. In a call on July 11, Delibro talked to his parents about closing his accounts and said, "I need that done…you don't have to send it, but I need it moved…I can't talk about it now but…just keep trying." *See* Exhibit C (Jail Call Transcripts) at 3. In a call on July 20, Delibro again discussed transferring money out of his name, including the money in an account in his and his mother's name. When his mother suggested taking the money and putting

it in an account with her, Delibro said, "No!...we want to take all that money and put it in another account of yours," before emphasizing, "*do not* put me on the account." *Id.* at 5. In a call during September discussing his two CIT Bank accounts, Delibro knew that he had "more than" $21,000 spread over two different accounts. *Id.* at 7-8. When his mother suggested keeping over $13,000 in the account she shared with Delibro, he said, "No! You gotta get that—No! No! No! No! No! That has me on it…I can't be on it. You have to take me off of it." *Id.* at 7. He also told his parents to put the money into their accounts, but, after some confusion, one of his parents said that they will "figure that out." *Id.* at 8. Delibro immediately and angrily retorted, "Not we'll figure that out! That's the whole point of getting it out of there, so I don't have it in my name." *See id.*; *see also* PSR ¶ 24**.** After getting Delibro's point, one of the parents said that they would get the money and have it sent to their home so "you can decide what, how, what to do with [it]" but never mentioned legal fees. *Id*. And, in October, Delibro let slip why he had been so insistent on moving money out of his name. He said: "I would do that [move the money] because you don't want it *taken*." *Id.* (emphasis added). at 18. CIT Bank issued a check for $21,313.56 to "Ross A Delibro" on September 18, 2024, as a "closing check," which his mother deposited in October.[10]

### 5.    Indictment and Guilty Plea.

A grand jury returned a three-count indictment for Delibro's production of CSAM, P2P network sharing of CSAM, and his possession of CSAM. Specifically, the Indictment charges Delibro with production of child pornography, in violation of 18 U.S.C. § 2251(a) (Count One), transportation of child pornography, in violation of 2252A(a)(1) (Count Two), and possession of

---

[10] Throughout the process, there was tremendous confusion among Delibro and his parents about whether there was still money in the account that was in both Delibro and his mother's name. Delibro apparently didn't realize that his parents had transferred the money from that joint account in late July 2024 to a separate account that his parents had established earlier that month.

prepubescent child pornography, in violation of 18 U.S.C. § 2252A(a)(5)(B) and 2252A(b)(2) (Count Three). The defendant pleaded guilty without a plea agreement to Counts One and Three on May 15, 2025.

**B.    The PSR and Sentencing Guidelines.**

**1.    The PSR Calculations and Guidelines Sentence of Life/600 Months.**

The PSR correctly determines that, based on Delibro's conduct, the ordinarily applicable Guidelines range of imprisonment is life, but that the range becomes 600 months because of the 50-year statutory maximum that applies to Counts One and Three, collectively. *See* PSR ¶ 90.

The parties do not dispute that Count One is governed by U.S.S.G. §2G2.1 with a base offense level of 32. Nor do the parties dispute that the base offense level is enhanced by 4 levels because the Minor Victim was not 12 years or older at the time of the offense, 2 levels because Delibro had "sexual contact" with the Minor Victim, 4 levels because the Minor Victim was a toddler, and another 2 levels because Delibro was a hired caretaker for the Minor Victim and, as a result, the victim was in the defendant's custody, care, and supervisory control. *See* PSR ¶¶ 28-32.

**2.    Counts One and Three Should Not Group.**

As reflected in the United States' objection to the PSR, *see* PSR Addendum 2 (Doc. No. 62-2), which it incorporates here, the United States believes that Counts One and Three should *not* group under U.S.S.G. § 3D1.2(b) because, among other reasons, Count Three includes victims who are not accounted for in Count One and because Delibro's possession of child pornography between December 2023 and May 2024—depicting known and unknown victims and sourced from file-sharing users on the internet—is an entirely separate criminal objective than his act of producing images in April 2024 of himself engaged in sexual activity with the Minor Victim. *See* U.S.S.G. §3D1.2, commentary ("[a] primary consideration in this section is whether the offenses

involve different victims…Cases involving injury to distinct victims are sufficiently comparable, whether or not the injuries are inflicted in distinct transactions, so that each such count *should be treated separately rather than grouped together*”); *see also id.* (specifying that “[c]ounts involving different victims…are grouped together only as provided for in [§3D1.2] subsection (c) or (d),” neither of which apply in this case). Because Counts One and Three should not group, Counts One and Three should both receive 1 grouping unit pursuant to U.S.S.G. §3D1.4(a), which result in a 2-level increase to the adjusted offense level. *See* United States’ Objections to the PSR, PSR Addendum, Doc. No. 62-2.[11] Ultimately, however, that increase has no meaningful effect if the Court adopts the other calculations in the PSR, as the maximum total offense level is 43. *See* U.S.S.G. Ch. 5 Pt. A, Note 2 (“An offense level of more than 43 is to be treated as an offense level of 43.”).

### 3. The PSR Correctly Includes a 2-Level Obstruction Enhancement.

Delibro objects to the PSR’s inclusion of a 2-level obstruction enhancement for providing materially false information to the Pretrial Services Officer completing a bail report, and, thus, the court. *See* PSR ¶ 32, U.S.S.G. §2G2.1(b)(5). Delibro claims that the enhancement doesn’t apply because that money was already earmarked to reimburse his parents for legal fees at the time of his arrest interview and, in any event, that the false information he provided wasn’t material. He is wrong about both.[12]

---

[11] In the event that the Court determines the counts do group, the United States agrees with the PSR’s conclusion that if Delibro’s conduct related to Count Three and the “commercial child pornography” is not “factored into [the defendant’s] guideline calculation…per USSG §5K2.0, the Court may consider this additional criminal conduct as an aggravating factor at sentencing.” *See* PSR ¶ 112.

[12] In light of the evidence of his obstruction, Delibro’s continued insistence that the money had been earmarked for the payment of legal fees at the time of his federal arrest is extremely concerning.

A 2-level enhancement for "obstructing or impeding the administration of justice" applies if: "(1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (a) the defendant's offense of conviction and any relevant conduct; or (b) a closely related offense[.]" U.S.S.G. §3C1.1. Helpfully, Application Note 4 to that Guideline provides a "non-exhaustive" list of "Examples of Covered Conduct" and includes, among others, "providing materially false information to a probation officer in respect to a presentence *or other investigation* for the court," "providing materially false information to a judge or magistrate judge," and "destroying or concealing or directing or procuring another person to destroy or conceal evidence that is material to an official investigation or judicial proceeding." *Id.* at Application Note 4(D), (F), (H) (Emphasis added).

Ultimately, it is not the list of non-exhaustive examples in the Application Notes that control whether the obstruction enhancement applies in a particular case, but rather whether the defendant has "willfully and materially impeded the search for justice in the instant offense," or, stated differently, engaged in conduct that has "the potential to impede the investigation, prosecution, or sentencing of the defendant." *United States v. Khimchiachvili*, 372 F.3d 75, 80 (2d Cir. 2004). Materiality is defined in the Guidelines' commentary to mean any "evidence, fact, statement, or information that, if believed, would tend to influence or affect the issue under determination." U.S.S.G. §3C1.1, Application Note 6. Although the obstructive or impeding conduct must be material, the "threshold for materiality is conspicuously low" and it is *not* necessary for the obstructive conduct to have achieved any intended purpose. *United States v. Gershman*, 31 F. 4th 80, 103-104 (2d Cir. 2022).

The PSR correctly adds a 2-level enhancement for obstructing or impeding the administration of justice. The PSR applies the enhancement—and disagrees with defense counsel's objection—because Delibro provided materially false information about his assets to the Pretrial Services Officer during his bail interview before his initial appearance and detention/bail hearing where Judge Vatti would consider, among other things, Delibro's assets when deciding whether to release or detain him before trial.

As an initial matter, the information that Delibro provided to the Pretrial Services officer and the Court was false. At the time he was asked about assets that he had, Delibro said that he had "one savings account through CIT Bank with a balance of $3,000" and "one retirement account through Vanguard with a balance between $2,000 and $4,000."[13] *See* PSR ¶¶ 24, 86 (including information from the Pretrial Services Report). That information is false for multiple reasons. First, Delibro didn't have just one account at CIT Bank, but two. *See* Exhibit B (Financial Documents from Accounts ending in -8947 and -4424). And, neither account had anything close to $3,000. Instead, one of the defendant's CIT Bank accounts had, at the time, over $21,000, and the other had over $13,000. *Id.*

Next, Delibro knowingly and willfully provided the false information. Within days of the initial appearance, Delibro repeatedly instructed his parents to move all his money out of accounts in his name—not just $3,000 from one account—and he would continue to do so for months until it was moved. That is consistent with someone trying to hide assets, just as the Delibro did for the bail report provided to the court. In fact, he later let slip in a call to his parents that seizing funds was exactly his concern: "I would do that because you don't want it taken." *See* Exhibit C at 19.

---

[13] He also failed to disclose that he had a Newtown Savings Bank account, which he has now disclosed and said contains $3,900. *See* PSR ¶ 85.

Finally, the false information was material. That Delibro's provision of false information about his assets was material and had the potential to "influence or affect the issue under determination" is not hypothetical. Magistrate judges are *required* by statute—"shall"—to "take into account the available information concerning…[the defendant's] financial resources" when determining detention or release. *See* 18 U.S.C. § 3142(g)(3)(A) ("Factors to be considered" under the Bail Reform Act). That is exactly what Judge Vatti did as he spent a significant amount of the hearing discussing a bond package and the assets available to Delibro, including his parents' home and the value of that home. *See* Doc. No. 44 at 13-33 (Transcript). False information that has the potential to affect bail or detention decisions fall within the Guidelines enhancement, even if it doesn't affect the outcome. *See, e.g., United States v. Taylor*, 31 F.3d 459, 467-68 (7th Cir. 1994) (upholding enhancement for misrepresentation of assets, which was material to whether the defendant was a flight risk); *United States v. Ojo*, 916 F.2d 388, 393 (7th Cir. 1990) ("providing false information to the pretrial services officer, who was conducting a bail investigation for the court, falls squarely within the [obstruction of justice] application note and led to a sentencing enhancement under U.S.S.G. §3C1.1"); *United States v. Greig*, 717 F.3d 212, 220-22 (1st Cir. 2013) (withholding assets from Pretrial Services could be a basis for an obstruction enhancement); *United States v. Magana-Guerrero*, 80 F.3d 398, 401 (9th Cir. 1996) ("providing materially false information to a pretrial services officer, whose job it is to conduct investigations for the court, constitutes obstruction of justice for purposes of section 3C1.1, without a specific showing that the falsehood actually obstructed justice"); *United States v. Gilbert*, 48 F.3d 1233 (Table) (10th Cir. 1995) (applying §3C1.1 to false statements related to pretrial release and noting that the enhancement "does not depend on whether the defendant was actually released").

Delibro challenges the PSR's conclusion that the information he provided about his assets was materially false because the "$21,313.56 in his CIT bank account was already owed to Mr. Delibro's parents for the repayment of legal fees" and he "understood that this was no longer his money." *See* Def.'s Sent. Memo at 5. That post-hoc excuse strains all logic. First, if, on the one hand, Delibro owed *all* of the money in his individual CIT Bank account—which was $21,313.56—to his parents for legal fees, and if he "understood that [it] was no longer his money" as he now claims, why, on the other hand, did he make up some number—$3,000—to give to the Court instead of just saying he had no money in that account? Second, if he owed all of his money to his parents, why was Delibro so insistent over the course of several months that his parents move any and all money out of "[his] name," rather than just telling them to take it for legal fees? Third, among others, if the money was actually earmarked for payment to his parents for legal fees *in July*, whey did his mother tell the defendant *in September* that she would save the money so he could "decide what, how, what to do with [it]" later instead of just keeping it for herself?

Delibro's post-hoc justification for lying to the Pretrial Services Officer and the court doesn't make sense in light of the jail calls. Delibro's focus on the calls was not payment of legal fees, but instead it was the money being in his name and ensuring that it doesn't get "taken," as he warned his parents. His parents' focus on the calls wasn't payment of legal fees, either, but rather doing what Delibro asked so Delibro could "decide what, how, what to do with [the money]" later. Delibro understood that he could face significant financial obligations—whether fines, special assessments, or restitution—and he didn't want that money touched. So he didn't disclose it to the Court, and he instructed his parents to move it anywhere except accounts in his name. All of that establishes by a preponderance that the information he provided to the Pretrial Services Officer and the court was false, and that he willfully withheld correct information.

Separately, not only did Delibro provide false information to the Pretrial Services Officer in advance of his initial appearance and detention hearing, but he actually succeeded in moving a significant amount of money out of accounts in his name. Had his conduct gone undetected, it almost certainly would have affected, at least, the prosecution and sentencing because a complete picture of Delibro's assets would not be available to the Court when assessing, among other things, a fine, restitution, and the potentially significant special assessments that apply in child exploitation cases. *See* U.S.S.G. §3C1.1, Application Note 4(D) (regarding obstruction and concealing evidence). Courts around the country have applied the enhancement to similar conduct because false financial information at sentencing "has a tendency to influence whether a fine is imposed and how restitution is structured." *United Stats v. Manojlovic*, 520 F. App'x 449 (7th Cir. 2013) (applying 2-level obstruction enhancement because the defendant "concealed assets from the probation officer who prepared the presentence report"); *see also United States v. Rathod*, 826 F. App'x 527, 536 (6th Cir. 2020) (similar and citing cases); *United States v. Adams*, 955 F.3d 238, 249-50 (2d Cir. 2020) (affirming obstruction enhancement where defendant "conceal[ed], transfer[ed], and fail[ed] to disclose his assets before sentencing).

The PSR correctly applies the 2-level obstruction enhancement in this case.

## II.    DISCUSSION

The United States respectfully asks that this Court impose a near-Guidelines term of 551 months' imprisonment, a $34,878.04 fine or special assessment, and a lifetime of supervised release based on the factors enumerated in 18 U.S.C. § 3553(a), including the seriousness of the offense, the defendant's criminal history and his characteristics, the need to deter the defendant and others from committing this crime in the future, the need to protect the public, and the application of the Sentencing Guidelines.

A.    **The § 3553(a) Factors.**

Following the Supreme Court's holding in *United States v. Booker*, 543 U.S. 220, 243-245 (2005), which rendered the Sentencing Guidelines advisory rather than mandatory, a sentencing judge is required to: "(1) calculate[] the relevant Guidelines range, including any applicable departure under the Guidelines system; (2) consider[] the Guidelines range, along with the other § 3553(a) factors; and (3) impose[] a reasonable sentence." *See United States v. Fernandez*, 443 F.3d 19, 26 (2d Cir. 2006). The Second Circuit reviews a sentence for reasonableness. *United States v. Canova*, 412 F.3d 331, 350 (2d Cir. 2005). The reasonableness standard is deferential and focuses "primarily on the sentencing court's compliance with its statutory obligation to consider the factors detailed in 18 U.S.C. § 3553(a)." *Id.*

Sentences within the Guidelines range are not automatically reasonable or unreasonable, but if a district court imposes a sentence outside the Guidelines range—whether higher *or* lower— it must "consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of variation." *See Gall v. United States*, 552 U.S. 38, 51 (2007). And, "[w]hen a factor is already included in the calculation of the Guidelines sentencing range, a judge who wishes to rely on that same factor to impose a sentence above or below the range must articulate specifically the reasons that this particular defendant's situation is different from the ordinary situation covered by the Guidelines calculation." *United States v. Sindima*, 488 F.3d 81, 87 (2d Cir. 2007).

1.    **The Seriousness of the Offense.**

It is difficult to overstate the depravity of Delibro's conduct. Before Delibro sexually assaulted the Minor Victim, he spent years positioning himself to be in almost constant contact with children. Then, on a day that the Minor Victim's family certainly wants to undo, Delibro sent

a solicitation. He reached out to the Minor Victim's mother, who needed an in-home caretaker while she and her husband worked, and said:

> I love helping children learn and watching them grow. Some of my favorite activities to do with children are; reading, building, playing sports, laughing and doing creative and Science-based activities. I have experience working with infants, toddlers and up to younger teens, helping them grow and meet childhood development milestones.
> . . .
> I always treat children with respect, speaking calmly, teaching manners and being a positive role model at all times.

*See* Exhibit A. The family had no reason not to believe him. Then he sexually assaulted their 2-year-old son at least once, recorded it, and saved to a computer-storage device that investigators still believe may be hidden and unaccounted for. Given that, the Minor Victim and his family may have to live forever with the knowledge that images of his sexual assault will never been recovered by law enforcement and may, instead, be potentially discovered, viewed, and shared in the future for the most despicable of purposes. Just like the other images and videos that Delibro saved on his devices and even shared using a largely anonymous P2P file-sharing program available to anyone around the world with an internet connection.

Research findings relevant to Delibro's CSAM-related conduct consistently show that this type of sexual abuse in childhood has lifelong repercussions. *See, e.g.,* B. E. Molnar et al., *Psychopathology, childhood sexual abuse and other childhood adversities: Relative links to subsequent suicidal behaviour in the US*, 31 Psych. Med., 965, 965 (2001) ("Child sexual abuse is an important risk factor for both psycho-pathology and suicidal behaviour. A review of 29 studies conducted between 1988-1998 estimated the odds of suicide attempts among adults sexually abused in childhood to be 1-3 to 25-6 higher than for those not sexually abused. Most major psychiatric disorders have been linked to child sexual abuse, especially depression, post-traumatic stress disorder and substance problems and dependence."). And victims of CSAM experience

additional harms. *See* Patti B. Saris et al., U.S. Sent'g Comm'n, *Federal Child Pornography Offenses* 112 (2012) ("Child pornography victims face other types of victimization that that are separate from the harm of production. Even after the physical abuse has ended, child pornography victims suffer due to continued circulation of their images or the ongoing potential for circulation of their images."). Victims of CSAM experience "suffering from the knowledge that the images of their graphic abuse are being utilized for sexual gratification." *Id*. at 113. And they experience trauma from not knowing who might see their images. *See id*. ("Victims suffer from not knowing who has seen their images. Victims 'report remaining always vigilant and fearful that any interaction with a computer might lead to exposure of the images of the sexual abuse that they have endured.' Victims fear that strangers they see on the street have seen images of their abuse, and they are ashamed and embarrassed that a teacher, a potential date, or a stranger in public will recognize them.") Those concerns certainly apply to the Minor Victim. By sharing and collecting videos and images of other victims, those concerns certainly apply to those victims of Delibro's crimes, too. The Victim Impact Statements already submitted demonstrate that. One victim said that he/she feels "tortured" as a CSAM victim and hopes that people who further victimize him/her by "sending, receiving, or possessing" pictures of his/her sexual assault get significant jail sentences. *See* Initial PSR, Victim Impact Statements, Doc. 61-2.

Publicly, Delibro told parents that he would care for and nurture their children. Privately, Delibro made, collected, and shared heinous images of children being sexually assaulted, digital files that may still exist on a removable storage device potentially within his constructive possession. Delibro took advantage of the Minor Victim in ways that he can't yet comprehend and that will affect him for life. ███████████████████████████

███████████████████████████████████████████████



Nothing about the seriousness of Delibro's conduct warrants a downward departure or variance from the Guidelines.

### 2.    History and Characteristics of the Defendant.

In the PSR and his sentencing memorandum, Delibro points to his alleged history of abuse, his mental and physical health, and his age as justification for his remarkable request for a 35-year departure or variance from the applicable Sentencing Guidelines. *See* Def.'s Sent. Memo at 7. To be sure, if Delibro's childhood and history of alleged sexual assaults were as he described them, they were tragic. But Delibro's difficult upbringing does not excuse (or even explain) his sexual abuse of the Minor Victim and victimization of the other children seen in the images and videos he possessed and/or shared. Many individuals grow up in "a religious household where emotions [are] rarely expressed" and where sexual orientations are hidden, like the one Delibro describes in his sentencing memorandum, *see* Def.'s Sent. Memo at 8, but the vast majority of them never go on to sexually abuse young children or participate in the CSAM marketplace.

This defendant's history and characteristics are particularly relevant when viewed against the nature of the crimes to which he admitted. That is, Delibro earned a degree in "early childhood education," and worked in preschools around other trained professions for approximately 10 years.

---

*See* PSR ¶¶ 71, 76-79. Surely, he learned in those settings how to properly care for, nurture, and educate children and, alternatively, the types of things that can negatively influence a child's growth and development. Delibro apparently ignored that specialized knowledge and experience and chose to victimize countless children, directly and indirectly. This double-life is beyond disturbing. He promoted himself on Care.com (and even his license plate) as someone who protects children, all the while he amassed a collection of images and videos that celebrated the sexual abuse of very young children (including infants and toddlers) and, on at least one occasion, personally sexually assaulted the Minor Victim, in the closet of the child's own bedroom to avoid detection. And, if Delibro was sexually abused as he reports, he knows firsthand the damage that childhood sexual assault inflicts, but instead of trying to protect children from such damage, Delibro built a life gaining access to children, obtaining recordings of children being raped, and even sexually assaulting one himself.

███████████████████████████████████████

███████████

Nothing about Delibro's specific and unique history and characteristics warrant a downward departure or variance from the Guidelines.

### 3.     Protecting the Public, Promoting Respect of the Law, and Deterrence.

Delibro's criminal conduct and history of building a life to access children make him a serious danger to the public. Not only did he sexually abuse a young child, but he brazenly did it in the child's home, while a parent was present in another room, and in a strategic way to avoid the video monitors set up in the child's bedroom. His unfortunate success and dogged determination to gain access to and sexually assault the Minor Victim underscores the danger he presents. Moreover, the fact that he engaged in such conduct separately from, and in addition to, collecting and sharing CSAM showing other prepubescent children being sexually victimized— all while having a background and education in childhood development—makes the danger he poses even clearer.[15] A significant sentence is not only appropriate, but it is necessary to protect the public from Delibro.

Such a sentence is also necessary to deter not only him, but others who would seek to sexually exploit children. General deterrence is an especially important factor because sex crimes against children are significantly under-detected and under-reported. *See* Saris et al., *supra*, at 295 ("It is widely accepted among researchers that sex offenses against children often go unreported and undetected," a factor that "always should be considered in assessing the results of a sex

---

[15] As referenced earlier, investigators still do not know what Delibro did with the removable storage device where he saved his CSAM—including the files related to the Minor Victim—and from which he likely ran the P2P file-sharing program. If he still has access to it, Delibro could potentially use that device to re-victimize the Minor Victim and all the other victims of his CSAM-related conduct.

offender recidivism study based solely on reported arrests or convictions."). It is thus vitally important to deter those who might commit such crimes by imposing significant sentences on those perpetrators who even attempt to do so. *See e.g. United States v. Nania*, 724 F.3d 824, 842 (7th Cir. 2013) ("The senseless acts of these criminals damage children for the rest of their lives. The government has understandably devoted considerable resources to deterrence—and that distinct objective warrants our attention. In that light, we find a 330-month consecutive [to a 103-year state sentence] sentence reasonable punishment.").

Nothing about the need to deter, promote respect for the law, and protect the public warrants a downward departure or variance from the Guidelines.

### 4.    The Guidelines Sentence.

Another § 3553(a) factor that this Court must consider is the sentencing range recommended by the United States Sentencing Guidelines, which in this case is the statutory maximum of 600 months' imprisonment. *See, e.g.,* 18 U.S.C. § 3553(a)(4). Delibro relies heavily on the Second Circuit's *Dorvee* case, says that there is "wide recognition that the Sentencing Guidelines applicable to sex offenses are excessive," and claims that his case does not fit within the "heartland" to which the Sentencing Commission intended the production of CSAM Guidelines to apply. *See* Def's Sent. Memo at 11-13. He is wrong.

By citing various out-of-circuit district court opinions, Delibro suggests that U.S.S.G. §2G2.1, which applies to the offense of production of child pornography, is entitled to little deference following the Second Circuit's decision in *United States v. Dorvee*, 616 F.3d at 174. *Dorvee*, however, involved the application of an entirely different Guideline, §2G2.2, in a case involving the distribution of CSAM by a first-time offender with no history of hands-on contact against a minor. It did not involve or address §2G2.1, which governs Delibro's production of

CSAM. *See United States v. Brown*, 843 F.3d 74, 92 (2d Cir. 2016) (distinguishing *Dorvee* and finding a 60-year sentence for three counts of production of pornography to be substantively reasonable). The Second Circuit has repeatedly held that:

> *Dorvee* does "not stand for the proposition that nearly any sentence for child pornography above the mandatory minimum is substantively unreasonable." *United States v. Muzio*, 966 F.3d 61, 64 (2d Cir. 2020). As we have explained, our warning in *Dorvee* that a "straightforward application of the sentencing Guidelines can lead to unreasonable sentences" arose in the "limited context" and "narrow circumstances" present in that case, which involved, among other things, a defendant who – unlike [the defendant] – "had no contact with children," even virtually. *Id.* at 64–65 (internal quotation marks omitted).

*United States v. Talada*, 828 F. App'x 52, 54 (2d Cir. 2020); *see United States v. Rafferty*, 529 F. App'x 10, 13 (2d Cir. 2013) (noting that concerns present in *Dorvee* were not present because "[defendant's] production of child pornography. . .is distinguishable from the conduct in *Dorvee*").

The Second Circuit's decision in *Muzio* illustrates the difference between CSAM trafficking and production offenses vis-à-vis the Sentencing Guidelines. In *Muzio*, the defendant manipulated multiple young girls into sending him sexually explicit pictures by posing as a cancer-stricken teenager. *Id*. at 62. Following his arrest, he pleaded guilty to two counts of production of child pornography, six counts of distribution of child pornography, and one count of possession of child pornography. *Id*. The district court imposed a 420-month sentence, and Muzio appealed, arguing that the sentence was substantively unreasonable and conflicted with *Dorvee* and *United States v. Jenkins*, 854 F.3d 181 (2d Cir. 2017). *Id*. at 64–66. The Second Circuit affirmed the sentence, explaining that "the concerns articulated in *Dorvee* and *Jenkins*" were "inapplicable" because Muzio "was involved in the production of child pornography and had direct contact with child victims." *Muzio*, 966 F.3d at 66. The defendant in *Muzio*, the court observed, was "undoubtedly a more 'dangerous' offender than Dorvee or Jenkins." *Id*. (quoting *Dorvee*, 616 F.3d at 187). The Second Circuit further explained that "[c]hild pornography production offenses are

extremely serious and ordinarily warrant significantly harsher punishment than possession or even distribution offenses." *Id*.

Judge Underhill, sitting by designation, dissented to the reasonableness of the sentence based on the facts of the case. He noted that the Guidelines could be "an exceedingly blunt tool in the child pornography context," *id*. at 71 (Underhill, J., dissenting), and he set out ten factors that courts should consider in sentencing a defendant convicted of producing CSAM. *Id*. at 78 (Underhill, J., dissenting). Those factors, with their application in this case, follow:

> 1. *Did the defendant engage in violence? The worst child pornography production cases involve the filming of child rape; forced or coerced sex acts are among the most serious offenses imaginable.*
>
> > As depicted in the recovered images, Delibro used his caretaker status to coerce a toddler into his closet, sit on Delibro's nude lap, and hold his erect penis while Delibro recorded it. The Minor Victim also told his parents that Delibro forced a finger into his anus and, among other things, ejaculated near him. *See* PSR ¶ 16.
>
> 2. *What is the nature of the sexual contact involved? The conduct ranges from no actual contact to touching of genitalia to full penetration or oral sex. Repeated conduct (multiple times or multiple victims) is substantially more serious than a single episode.*
>
> > There was actual sexual contact here where a toddler directly contacted Delibro's aroused penis. Moreover, the Minor Victim reported having his anus penetrated by Delibro's finger, that Delibro "liked [his] butt," that Delibro ejaculated near him, and that Delibro would "bite" and "kiss" his penis. *See* PSR ¶ 16.
>
> 3. *How was the pornography produced? Was the defendant filming his own interaction with the victim, filming another's interaction, passively recording through a hidden surveillance device, or soliciting victims' selfies? Did the defendant participate alone or with others?*
>
> > Delibro filmed his own hands-on abuse of the Minor Victim. This was not a hidden and passive surveillance device or enticement.
>
> 4. *What was the extent of the distribution or use of the images? Was there a commercial exploitation? How wide was distribution on the internet? Were the images used as currency or to barter?*

The United States does not know of any instances involving distribution of the recovered images of the Minor Victim. As explained earlier, the United States has not recovered the device to which Delibro saved the images or used to run his P2P file-sharing program.

5. *Did the defendant engage in deceit or trickery, including identity misrepresentation? Fraudulently inducing "voluntary" participation of the victim reflects serious wrong-doing.*

Delibro was hired as the Minor Victim's nanny and caretaker after telling the child's family that he "always treat[s] children with respect, speak[s] calmly, teach[es] manners and [is] a positive role model at all times." Additionally, the information that the Minor Victim provided suggests that Delibro would lure the toddler into his closet with legos, and when asked what happened in the closet, the child reported that Delibro "likes my butt." PSR ¶ 16.

6. *How many films or images did the defendant create? Production of a large volume of material reflects consciousness of wrongdoing.*

The United States does not know because Delibro deleted them from his device after saving them to a removable storage device that hasn't been recovered. The images recovered are system-generated cached images.

7. *How old was the victim or victims? The age of a victim can dramatically affect the crime's seriousness; in general, the younger the more serious, with crimes involving very young victims being especially horrific.*

The Minor Victim was very young, a 2-year-old toddler. Notably, the evidence indicates that Delibro targeted *only* the youngest child in the home, as the Minor Victim's older brother did not report any abuse. *See* PSR ¶ 16.

There are victims of Delibro's possession offense, too, and it appears that Delibro favors young children based on, among other things, the filenames associated with his P2P program. *See* PSR ¶ 11 (noting that the terms "baby," "toddler," "diaper," "infant," "cry," "scream," "1yo," "2yo," "3yo," or "4yo" appear, collectively, over 1,200 times in the P2P-associated filenames).

8. *How many victims were there? The number of victims and the length of time over which the conduct occurred both can reflect seriousness.*

The United States is only aware of one victim of Delibro's hands-on abuse. Delibro, however, built his life on access to children and, despite being a caretaker, possessed and shared images and/or videos of other children being raped. *See above*.

9. *What relationship/responsibility did the defendant have vis-à-vis the victim? Was the defendant a parent, guardian, relative, babysitter, or person with authority over the victim?*

The defendant was hired to care for the 2-year-old Minor Victim after directly contacting his family via Care.com to sell his services. The Minor Victim's family trusted him to provide the services he advertised, but, instead, he sexually assaulted the Minor Victim in the family's home while a parent was just steps away. His abuse of trust is plain.

10. *What was the intellectual capacity of the victim? Was the victim mentally disabled, drugged, or too young to resist/understand?*

The Minor Victim was 2-years-old and far too young to resist or understand what was happening. Delibro may have even lured the Minor Victim to his closet with toys. *See* PSR ¶ 16.

As applied to the facts in this case, the Second Circuit caselaw post-*Dorvee* as well as the *Muzio* factors establish that Delibro's conduct is serious enough to warrant a Guidelines sentence and that Delibro's request for a 35-year departure or variance is entirely unreasonable. Delibro engaged in a hands-on sexual assault of a 2-year-old who later reported, among other things, that (a) he had seen "white juice" come out of Delibro's penis and (b) Delibro had inserted his fingers into the child's anus. Delibro was an active participant in the images recovered, which showed him and the Minor Victim hidden in the child's closet, likely to avoid detection by a baby monitor set up in the room and while a parent was working in another part of the home. The Minor Victim was "very young," 2-years-old at the time, and far too young to resist Delibro or understand what was happening.  And, among other things, Delibro exploited a position of trust to sexually abuse the Minor Victim. So, by either standard—U.S.S.G. § 2G2.1 or Judge Underhill's 10-factor test—Delibro's conduct was egregious and warrants a significant sentence. And that doesn't account for

Delibro's possession and sharing of CSAM involving other young victims, who are repeatedly victimized by conduct like the defendant's.

In addition to attacking U.S.S.G. §2G2.1 as generally unreliable, Delibro also contends that the facts of his particular case fall outside the "heartland" of CSAM production offenses to which the Guideline is intended to apply. Though the discussion above shows that Delibro is wrong, he suggests that is the case because, in part, "there is no evidence that the two photographs Delibro took were distributed or shared in any way," and because there are two enhancements in §2G2.1 that address the age of the victim. *See* Def's Sent. Memo at 13. There are multiple problems with those arguments.

First, Delibro's suggestion that §2G2.1 is too harsh because "there is no evidence that the two photographs Delibro took were distributed or shared in anyway" implies that §2G2.1 should only apply to cases involving distribution. That argument ignores the fact that §2G2.1 includes a distribution enhancement at §2G2.1(b)(3), *which the PSR does not apply in this case*. PSR ¶¶ 29-36; *see also* U.S.S.G. § 2G2.1(b)(3) ("If the defendant knowingly engaged in distribution, increase by 2 levels.").[16] Second, Delibro's additional suggestion that §2G2.1 is too harsh because the age of the victim is double counted is wrong. The Guidelines reflect the view that victimizing a child under 12 is bad, and that victimizing an infant or toddler is worse. That is why a defendant who victimizes an 11-year-old, for example, gets a 4-level enhancement, *see* U.S.S.G. § 2G2.1(b)(1)(A), and a defendant who victimizes an infant gets an additional 4-level

---

[16] Although investigators have not found evidence that Delibro distributed the images of him sexually assaulting the Minor Victim, his argument also ignores the fact that he saved the images of his sexual assault to the same device from which he likely ran his P2P file-sharing program, which investigators do not have.

enhancement, *see* U.S.S.G. § 2G2.1(b)(4)(B). Contrary to the defendant's argument, this case falls precisely within the "heartland" of the Guidelines.

Finally, Delibro cites *United States v. Mishoe* in his argument for a well-below Guidelines sentence. *See* Def's Sent. Mem. At 15. *Mishoe* has no bearing on this case. There, the district court departed downward because, in its view, the applicable Career Offender Criminal History Category of VI overrepresented the defendant's "street-level drug selling." *Mishoe*, 241 F.3d at 219. The Second Circuit reversed and addressed situations in which a "horizontal departure" may be appropriate in order to arrive at a more appropriate criminal history category. *Id.* at 215. Unlike *Mishoe*, Delibro is not a career offender where his Criminal History Category overrepresents his actual past criminal conduct. Instead, his Criminal History Category of I accurately reflects the fact that he has no criminal history. And his citation to the District of Massachusetts's *Germosen* case doesn't change that. *See* Def's Sent. Memo at 15, citing *United States v. Germosen*, 473 F. Supp. 2d 221, 227 (D. Mass 2007). In that case, the defendant agreed to transport drugs into the United States on a single occasion out of financial desperation, and his conduct was entirely out of step with his usual lifestyle. *Id.* As a result, the court departed downward because even a Criminal History Category I overstated the severity of the defendant's conduct. *Id.* at 230. Here, Delibro's conduct was more than a one-time lapse committed out of financial desperation. Instead, Delibro exploited children in different ways—in person, by online file sharing, and by continued possession CSAM—over a period of time. Furthermore, Delibro is a dangerous sex offender under the Guidelines, which is why he doesn't qualify for any further reductions under the new provisions for certain "zero-point offenders." *See* U.S.S.G. §4C1.1(a)(5) (prohibiting a zero-point-offender for sex offenses).

Nothing related to the Guidelines warrants a downward departure or variance.

### 5. Avoiding Unwarranted Sentencing Disparities.

Delibro argues that a 35-year downward departure or variance to the statutory minimum will achieve § 3553(a)(6)'s goal of avoiding sentencing disparities. In support of that argument, he likens his case to others in which the district court-imposed sentences lower than Guidelines sentence here. But that approach suffers from several significant flaws, and the Court should reject it for the reasons discussed below.

First, a sentence outside the Guidelines range is more likely to create disparities than one within it. "[A] reviewing court's concern about unwarranted disparities is at a minimum when a sentence is within the Guidelines range." *United States v. Irving*, 554 F.3d 64, 76 (2d Cir. 2009). "The 'avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges.' Thus, where, as here, 'the District Judge correctly calculated and carefully reviewed the Guidelines range, he necessarily gave significant weight and consideration to the need to avoid unwarranted disparities.'" *Id.* (quoting *United States v. Gall*, 552 U.S. 38, 54 (2007)); *see also United States v. Sanchez*, 989 F.3d 523, 541 (7th Cir. 2021) ("[T]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly."); *United States v. Boscarino*, 437 F.3d 634, 638 (7th Cir. 2006) ("Sentencing disparities are at their ebb when the Guidelines are followed, for the ranges are themselves designed to treat similar offenders similarly. That was the main goal of the Sentencing Reform Act. The more out-of-range sentences that judges impose after *Booker,* the more disparity there will be.").

Second, § 3553(a)(6) requires a district court to consider nationwide sentence disparities, but does not require a district court to consider case or district-specific disparities. *United States v. Hatala*, 552 F. App'x 28, 31 (2d Cir. 2014) ("[T]he disparity referenced by 18 U.S.C. § 3553(a)(6)

is national, not case-or district-specific.").

In this case, the nationwide considerations are partially, *but only partially*, captured in the JSIN data, which reveals that defendants whose primary Guideline provision was §2G2.1 with a final offense level of 43 and a Criminal History Category of I received a median sentence of 360 months' imprisonment and an average sentence of 348 months' imprisonment. *See* PSR ¶ 92. What that data necessarily reveals, however, is that roughly 50% of sentences in such cases are *higher* than the median of 360 months' imprisonment.

And, the JSIN data has its limitations, particularly in cases involving long sentences and when looking at averages. That is because the Sentencing Commission has opted to assign 470 months in the JSIN data to all sentences at or greater than 470 months, including life sentences. *See* JSIN Database, Frequently Asked Questions, *available at* https://www. ussc.gov/guidelines/judiciary-sentencing-information. Finally, the JSIN numbers are based on the applicable Guideline and Criminal History Category, not the number of counts or individualized offense conduct, making it difficult to compare cases involving, for example, one count and a 360-month statutory-maximum sentence, with cases involving multiple counts, or, like here, counts of production and CSAM possession, receipt, or distribution. As a result, in cases where the Guidelines are at the top of the table or life, the JSIN numbers under-reflect actual sentences, like the 210-year sentence (2,520 months) that Judge Meyer imposed for production with multiple young victims in *United States v. Tilton* or that other judges around the country have imposed in other CSAM-related cases. *See United States v. Mazer* (E.D. Pa.) (720-month sentence for person who produced child pornography while babysitting a friend's two children) *available at* https://www.ice.gov/news/releases/pennsylvania-man-sentenced-60-years-production-child-pornography; *United States v. Hackney* (N.D. Tex.) (600-month sentence for one count of

production and one count of transportation) *available at* https://www.justice.gov/usao-ndtx/pr/fort-worth-man-sentenced-50-years-producing-child-pornography; *United States v. Franklin* (D. Colo.) (100-year sentence for advertising, receipt, distribution, and possession of CSAM, but not production) *available at* https://archives.fbi.gov/archives/denver/press-releases/2013/denver-man-sentenced-to-100-years-in-federal-prison-for-advertising-child-porno graphy-and-other-child-pornography-related-crimes; *United States v. Gonzalez* (S.D. Fla.) (similar 100-year non-production sentence) *available at* https://www.secretservice.gov/press/releases /2017/02/miami-dade-county-man-sentenced-100-years-prison-child-pornography-offenses.

Of course, nothing prevents a district court from considering disparities on a case-by-case basis, *see United States v. Holder*, 586 F. App'x 82, 84 (2d Cir. 2014) ("We have held that while 18 U.S.C. § 3553(a) permits district courts to consider such disparities, it does not require them to do so."), but doing so is often fraught with challenges. That is because "disparity will always exist so long as sentences are based upon the specific facts of each individual defendant's case." *United States v. Granados*, 962 F.2d 767, 774 (8th Cir. 1992). Indeed, any number of variables may persuade a sentencing court in one case to give more weight to a sentencing factor than a judge in another case. After all, no two defendants are exactly alike, and rarely will they engage in identical criminal conduct.

For that reason, courts generally require that, "[t]o present '[a] well-founded claim of disparity,' a defendant must compare apples to apples." *United States v. Rosario*, 143 F.4th 41, 48 (1st Cir. 2025) (quoting *United States v. Mateo-Espejo*, 426 F.3d 508, 514 (1st Cir. 2005)). "[A]nd 'material differences' between the defendant and the proposed comparators such as 'dissimilar criminal involvement, criminal histories, or cooperation with the government' destroy a disparity claim." *United States v. Candelario-Ramos*, 45 F.4th 521, 526 (1st Cir. 2022) (quoting *United*

*States v. Romero*, 906 F.3d 196, 211–12 (1st Cir. 2018)).

Here, Delibro does not "compare apples to apples." Meaningful and significant differences exist between the cases he cites and his own, and those differences warrant imposing a more significant sentence in his case. Some of the cases he cites include:

a. ***United States v. Nathaniel Smith*, 3:16-CR-48 (MPS)**: Unlike Delibro, the defendant in this case suffered from a "rare and severe condition," which Judge Shea found was one reason meriting a downward departure. *See* Judgement, *United States v. Smith*, 3:16-CR-48 (D. Conn. Apr. 12, 2017), ECF No. 65. Moreover, Smith was not in a position of trust, like Delibro as a caretaker.

b. ***United States v. Galpin*, 3:21-CR-26 (JAM)**: The defendant trafficked CSAM through a chat group he operated on the social media application Kik. He also produced CSAM of several victims, but they were significantly older than the victim in this case (17, 15, 14, and 17 years old). Only one of those instances of production appeared to involve hands-on contact with a victim. The remaining instances involved persuading victims to produce material over the internet and taking voyeuristic images of a victim with a hidden camera. While the case is serious, it did not involve the misuse of a close position of trust to accomplish the hands-on sexual abuse, and, among other things, it did not involve a very young victim.

c. ***United States v. Butts*, 3:23-CR-201 (KAD)**: The defendant pled guilty to possession of child pornography.  In the stipulation of facts, he admitted to enticing an 11-year-old girl and a 17-year-old girl to send him sexually explicit images by, among other things, threatening them. There was no abuse of a position of trust, no hands-on offense, and the victims were considerably older than the Minor Victim in this case. Judge Dooley nevertheless imposed a statutory-maximum sentence based on the count of conviction, which was 20 years.

d. ***United States v. Dos Reis*, 369 F.3d 142 (2d Cir. 2004)**: The defendant traveled to have sex with a 15-year-old girl and a 13-year-old girl, one of whom died from asphyxiation while he raped her. The Guideline that applied was not the Guideline that applies in this case, and it resulted in a sentencing range of 70-87 months' imprisonment. Judge Underhill upwardly departed as far as possible to impose the statutory-maximum sentence for each count of conviction, then ran those sentences consecutively.

Additionally, just as Delibro can cherry pick cases, so too can the government find cases where courts in this district have imposed sentences near or above the Guidelines level, or even at the statutory maximum. That was true in both *Butts* and *Dos Reis*, cited above and by Delibro, where the sentencing courts imposed the highest possible sentence authorized by law. In *United*

*States v. Roman*, 3:23-CR-3 (VLB), Judge Bryant imposed a sentence of 400 months where the defendant recorded his sexual abuse of two minor victims who had been entrusted to his care, though that sentence was later reduced to the statutory maximum of 360 months' imprisonment. In *United States v. McGuire*, 3:20-CR-153 (RNC), Judge Chatigny imposed a statutory-maximum 360-month sentence on a defendant who recorded his sexual abuse of one child. In *United States v. Roberto Acosta-Torres*, 3:21-CR-139 (JBA), Judge Arterton imposed a statutory-maximum 30-year sentence on a defendant who recorded the repeated his sexual abuse of a child in his care (and who was significantly older than the Minor Victim in the instant case).

The United States cites these cases not to argue that Delibro is like any one of those defendants. He is not. Rather, the United States hopes to highlight the reality that drawing parallels with other cases in the hope of obtaining a similar sentence will often paint an incomplete picture and fail to capture the meaningful and inevitable differences between the other defendants and their conduct. Ultimately, those differences are important because after "consider[ing] all of the section 3553(a) factors, the district court must reach 'an informed and *individualized* judgment in each case as to what is "sufficient, but not greater than necessary" to fulfill the purposes of sentencing.'" *United States v. Pugh*, 945 F.3d 9, 24 (2d Cir. 2019) (quoting *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc)) (emphasis added). As the Second Circuit has recognized, this task may take different paths and result in different outcomes from one sentencing court to another because, "[s]entencing is not, after all, a precise science" and "[r]arely, if ever, do the pertinent facts dictate one and only one appropriate sentence." *United States v. Jones*, 531 F.3d 163, 174 (2d Cir. 2008) (cleaned up).

In this case, the § 3553(a) factors support a sentence at or near the Guidelines range, which is a conclusion unaffected by the cases Delibro cites. The cases he relies on are materially different

and the United States knows of no meaningful way to "articulate specifically the reasons that this particular defendant's situation is different from the ordinary situation covered by the Guidelines calculation," let alone to do so in a way that supports the 35-year downward departure or variance that Delibro requests. *See Sindima*, 488 F.3d at 87. A sentence of 551 months' imprisonment, which is near the Guidelines recommendation, but accounts for Delibro's time in state custody and acceptance of responsibility, is sufficient and not greater than necessary.

## III.    OTHER SENTENCING CONSIDERATIONS

### A.    Restitution and Defined Monetary Assistance.

None of the victims in this case have specifically requested that the Court determine the precise amount of restitution owed. Instead, the United States requests that the Court make a finding that the victims in this case, including, but not limited to, the Minor Victim, are "victim[s] of the defendant who was convicted of trafficking in child pornography" pursuant to 18 U.S.C. § 2259(d). Qualifying "trafficking in child pornography" offenses are defined by statute and include the possession, receipt, and distribution of child pornography. *See* 18 U.S.C. § 2259(c)(3). Because Delibro pleaded guilty to possessing child pornography, which included images of the Minor Victim and others, the victims in this case meet the statutory definition. Once this Court enters such an order, the victims will be able to obtain "defined monetary assistance" via a separate process from the Child Pornography Victims Reserve. *See* 18 U.S.C. § 2259(d)(1)(C).

### B.    Special Assessments and Fines.

Delibro is subject to mandatory special assessments of $100 for each count of conviction pursuant to 18 U.S.C. § 3013. In addition, he is subject to an additional mandatory assessment of $5,000 pursuant to the Justice for Victims of Trafficking Act of 2015, unless this Court finds that he is indigent. 18 U.S.C. § 3014. He is also subject to additional assessments of up to $50,000 on

Count One and $17,000 on Count Three pursuant to the Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018 and the factors found at 18 U.S.C. § 3553(a). *See* 18 U.S.C. § 2259A(a), (c). And, the Guidelines recommend a fine of $50,000 to $500,000. *See* U.S.S.G. §5E1.2(c)(3).

The United States requests that the Court find that Delibro is not indigent, order him to pay $5,000 pursuant to the Justice for Victims of Trafficking Act of 2015, and enter an order requiring Delibro to pay $34,878.04 as a fine or assessment pursuant to the Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018. That amount reflects the money that Delibro attempted to shield from the consequences in this case, as discussed above.

### C.    Supervised Release.

Following any sentence of imprisonment, the United States requests that the Court impose a lifetime of supervised release with all of the special conditions included in the PSR. *See* PSR ¶ 124(1)-(19).

## IV.    CONCLUSION

Delibro would have this court believe he is changed, wants closure, and cares about the victims of his conduct. But all of his conduct over many months shows just how hollow those words are and, instead, how self-interested he truly is. He was hired to care for the Minor Victim but sexually assaulted him out of his own deviant sexual self-interest without regard for the Minor Victim or his family. His self-interest reappeared when he warned the Minor Victim that he (Delibro) would get in "big trouble" if anyone found out. He was a sophisticated computer user who used his knowledge to protect himself as he saved images of his assault to a removable device that he likely also used to connect with a P2P file sharing system to obtain, share, and possess videos of other children being raped. He didn't want to risk his money, so he lied repeatedly to

38

investigators and the Court via Pretrial Services, and then enlisted his parents to actually move it

so it wouldn't get "taken." He may still have constructive possession of the removable drive on

which he stored his CSAM library and likely ran his P2P file-sharing program. ███████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████████████████████

       Before imposing sentence, Courts are required to calculate the Guidelines—which are the

"starting point and initial benchmark" in sentencing—and only vary up or down when there is a

"justification [that is] sufficiently compelling[.]" *Gall v. United States*, 552 U.S. 38, 51 (2007).

There is no basis for a downward departure in this case, and there is no articulable "sufficiently

compelling" justification to vary far below a Guidelines sentence, let alone vary downward by 35

years as Delibro requests. Instead, the following sentence is sufficient, but not greater than

necessary, based on the unique facts and circumstances of this case: (a) 551 months' imprisonment,

which is a 4-year reduction from the Guidelines based on time that Delibro has served in state

custody and one year for each of his three acceptance-of-responsibility levels; (b) a $34,878.04

fine or special assessment; and (c) a lifetime of supervised release.

Respectfully submitted,

DAVID X. SULLIVAN
UNITED STATES ATTORNEY

_/s/Daniel George_
DANIEL GEORGE
ASSISTANT UNITED STATES ATTORNEY
FEDERAL BAR NO. phv207404
157 Church Street, 25th Floor
New Haven, CT 06510
Daniel.George@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 1, 2025, a copy of the foregoing Sentencing Memorandum was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

*/s/ Daniel George*
Daniel George
Assistant United States Attorney